**Opinion filed June 20, 2019**



## In The

# Eleventh Court of Appeals

_____

## No. 11-17-00187-CV

_____

## IN THE INTEREST OF J.H.C. AND I.K.C., CHILDREN

**On Appeal from the 326th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 49534-C**

## M E M O R A N D U M   O P I N I O N

Father appeals the trial court's final decree of divorce dissolving his marriage to Mother. In four issues, Father asserts that (1) there is insufficient evidence to support the trial court's appointment of Mother as the sole managing conservator of the parties' two children or the trial court's order that Father have only limited contact with the children and (2) the trial court erred by ordering Father to surrender possession of his firearms for a period of ninety days and to undergo an evaluation and participate in counseling. We affirm.

*Background Facts*

Father and Mother met through a youth group at a church in Coleman. Father was thirty-seven years old and the youth pastor at the church. Mother was sixteen or seventeen years old and a member of the youth group. According to Mother, she had been "off doing all sorts of crazy bad things" and was involved in an inappropriate relationship with a teacher at her school. When Mother realized how "bad of a situation it was," she turned to Father for advice on what she should do to get out of the "trouble [she] was in."

Father did not advise Mother to report the relationship with her teacher to the authorities. Rather, he told Mother that she was in the situation because of her choices and that God would not approve of the choices she had made. Father also told Mother that she needed to "figure out" what she wanted. Father then initiated a sexual relationship with Mother. After Father said that "it was . . . either [the teacher] or him," Mother ended her relationship with the teacher.

According to Father, he and Mother were initially just friends. However, the pastor of the church, as well as a deacon and his wife, commented on how well Father and Mother "got along" and encouraged them to date. Father and Mother "considered it and then one thing led to another." Father denied that he had had a sexual relationship with Mother before they were married.

Mother testified that, "towards the end of [her] 17-year mark," church leaders discovered her relationship with Father. The church leaders told Father that he could either leave the church quietly or be fired. Father told Mother that he was forced to leave one of his previous churches because of his relationship with a teenager in his youth group. Father was distressed over the situation at the church and told Mother that, if he was fired from the church and she left him, he would lose everything he

had and would have no reason to live. Father pressured Mother to commit to him and made it "sound like he was going to get his gun." Because Mother thought Father was going to kill himself, she told him that she was "just going to marry [him] and that is going to be the end of that."

Father, however, denied that he had had an inappropriate relationship with a teenager at his prior church, was fired from that church, or was forced to leave the church in Coleman because of his relationship with Mother. Rather, he left the church in Coleman because he was "burned out" on ministry. Father denied threatening to commit suicide if Mother would not marry him.

Father and Mother married three days after Mother's eighteenth birthday. Father then moved from Coleman to Abilene and obtained his license to sell real estate. Mother remained in Coleman until she graduated from high school and then joined Father in Abilene. Father and Mother began attending a church outside Abilene. Father was asked to become the youth pastor at the church and, several years later, to be the pastor of the church.

J.H.C., the parties' first child, was born after Father and Mother had been married for five years. Approximately seventeen months later, I.K.C. was born. When I.K.C. was five months old, Father and Mother became the guardians of Father's great-nephew, who was eight months old. For three years, Mother was a stay-at-home mother to all three children.

Father's great-nephew had a number of medical problems. Mother became interested in the "medical aspect" of his care, and the parties decided that Mother would attend nursing school. While Mother attended school, Father was the primary caregiver for the children. After Mother graduated from nursing school, she began working full time as an emergency room nurse.

The parties' relationship soon began to deteriorate. According to Mother, Father did not like her friends and began going through the text messages on her phone. He also began attacking her and her friends in conversations with church members and in his sermons. Greg McEachren, a member of the church, confirmed that Father began to speak negatively about Mother to church parishioners and to incorporate complaints about Mother into his sermons. Father, however, denied that he "abused the pulpit" to attack Mother.

Although the record is not clear on the timing, at some point, Father and Mother had a discussion about temporarily separating. Father opposed the separation and stated that he thought that it was best for Mother and the children if he just "[blew his] head off." Father then "methodically" kissed Mother, "like good-bye forever," and left the house. Mother was afraid that Father had a gun, was very worried about him, and attempted to find him. Mother later decided that Father got "joy" out of upsetting or "drawing emotion" out of her. Father described the incident as a "tit for tat" because, the previous night, Mother had said that it would be better if she was dead and then she had gone for a long drive. Mother, however, denied that she threatened to kill herself; rather, she told Father that she needed some time away and that she was going for a drive.

Mother asked Father to participate in marriage counseling, and they attended two counseling sessions with Margaret Shugart. Father then suggested to Mother that they get "true Christian counseling" from McEachren and his wife. Mother went to a third counseling session with Shugart to tell her of the change in plans. At the end of the session, Shugart gave Mother literature describing the attributes of nonviolent, healthy relationships and of violent, unhealthy relationships. Mother became "scared" after reviewing the information because, in her opinion, Father

matched "every one of the attributes of the unhealthy, violent relationship" but matched "very few of the healthy side."

McEachren testified that Father had indicated that he was the victim and that none of the problems in the marriage were his fault. The McEachrens, therefore, had a lot of animosity toward Mother at the start of the counseling sessions. However, after listening to Mother, the McEachrens realized that many of the things that Father had said were not true. Further, during the counseling sessions, Father "owned up to . . . the verbal abuse that he would do, the manipulation, the lying, [and] the victimization."

McEachren testified that he and Father had several more meetings at which they discussed that Father was not doing what he needed to do to save the marriage. In McEachren's opinion, it got to the point that Father was just lying to him. Father, however, testified that he had only one conversation with McEachren after the first counseling session and that McEachren became very angry during that conversation. Because Father was afraid of the "violence" in McEachren's voice, he hung up and never spoke to McEachren again.

Father and Mother subsequently made plans to spend an afternoon together to work on their relationship. According to Mother, McEachren called Father that morning and "got onto him about the lies." Father then called Mother. Mother and the McEachrens happened to be at the same coffee shop when Father called, and Mother took the phone call outside. Father was infuriated and "just really mad" at McEachren. Because Father was so upset, Mother told him that she did not think that they should meet that afternoon.

A couple of minutes later, the McEachrens and Mother were together in the coffee shop when Father called Mother again. In contrast to his demeanor during

the first phone call, Father was calm and "methodical[ ]." Father again asked Mother to meet him. When Mother hesitated, Father said: "It's not like I am going to take you out in the woods and shoot you." McEachren, who overheard the statement, testified that this was the first time he saw any indication that Father was violent.

Although Mother was frightened by the conversation, she agreed to meet Father for lunch. Mother gave Father an "ultimatum" and told him that he needed to get psychological help due to his erratic behaviors that were "freaking [her] out." Father responded that Mother needed to get psychological help and to get back on her "meds," meaning the antidepressant that Mother was taking when she was at home with three young children. Mother testified that Father liked her to take the medication because she became a "zombie" and did not give him any "push back." That evening, Mother told Father that they needed a weekend apart. Mother explained that the children would stay with her mother and that she would stay with a friend.

Mother had seen Father angry before when she made a decision that he did not like. Mother also knew that Father owned a number of pistols, rifles, and shotguns and had placed loaded guns throughout the house after receiving a threat from his nephew. When Father heard Mother's plan for the weekend, he became very angry and shoved his hand under a pillow. Mother was afraid that Father was getting a gun and was going to shoot her. Although Father was only retrieving his phone, Mother decided that she should not be in her home if she did not feel safe. Mother and the children left the house for the weekend.

Mother instructed her mother to meet Father at church with the children on Sunday morning. However, after learning that some of the leadership of the church might confront Father about his behavior, Mother became concerned that Father

would "lose control" in front of the children and instructed her mother not to take the children to church. According to Mother, this "infuriated" Father, and she began receiving text messages from members of the church about "stealing [Father's] kids." Mother left work, called the sheriff's office, locked the children inside a house in Coleman, and barricaded the back door. The next day, Mother contacted a lawyer to "start the process" because the situation was so unhealthy.

A couple of weeks later, Mother moved things out of the parties' house and then went to pick up I.K.C. from daycare. After signing out I.K.C., Mother approached the daycare director about why I.K.C.'s maternal grandmother had not been allowed to pick up I.K.C. The director told Mother that, earlier that day, Father had removed I.K.C.'s grandmother from the list of people who could pick up I.K.C. and had attempted to remove Mother from the list as well. After Mother finished her conversation with the director, she turned around to see that I.K.C. was gone. Mother panicked, ran outside, and found I.K.C. "standing" in Father's pickup with the doors locked. Father was standing nearby, recording Mother. Father told Mother that he took I.K.C. in order to obtain a guaranty from Mother that he would see the children again. He then said: "[N]ow, who looks like the crazy one?"

After Mother filed for divorce, the parties agreed to temporary orders naming them joint managing conservators of the two children and setting a possession schedule that gave each of them equal periods of time with the children. Mother testified that she agreed to the schedule because she wanted to be as fair as possible, she would not have to hire a nanny to watch the children while she was at work, and she did not think the children would be in danger as long as Father thought he was in control. Mother explained that, at the time she agreed to the temporary orders,

she did not understand how "detrimental" it would be to the children to allow Father to have so much time with them.

According to Mother, Father had a "meeting spot" inside the school where he waited every morning for J.H.C., who was six years old. Father also often ate lunch at school with J.H.C. and made sure to see her after school when he picked up his great-nephew. If J.H.C. was leaving with Mother, Father would demand that J.H.C. give him a hug before leaving. According to Mother, J.H.C. now panics and is distraught if she is required to leave school before seeing Father.

Father also began calling the children every night at 8:00 p.m., just before their bedtime. During these conversations, Father repeatedly told the children that he missed them, that he could not stand it when they were gone, and that he had nothing to do without them there. Mother believed that Father made the children feel guilty about being with her. The telephone conversations would put the children into a "tail spin" of sobbing and crying right before their bedtime. In Mother's opinion, Father's conduct was "wrecking" the children, and J.H.C.'s need to please Father had become "very concerning."

Father testified that he acted appropriately with the children. He denied that he required J.H.C. to meet him every morning before school. Rather, J.H.C. always waited at the same place and came to meet him when he arrived with his great-nephew. Further, he ate lunch with J.H.C. at school even before the parties separated and believed that it was a "blessing" for J.H.C. to have lunch with him.

In October 2016, the children started attending counseling sessions with Rebecca McMurray, a marriage and family therapist. Father attended one of the children's counseling sessions and asked how he could improve with the children. McMurray told Father that, based on what she observed during the session and the

fact that the children loved him, he was doing a good job. In McMurray's opinion, Father was "not a terrible, no-good, very-bad parent," but he had "some boundary problems" with the children, particularly with J.H.C. McMurray explained that J.H.C. displayed signs of "enmeshment" with Father, meaning the "boundaries have been crossed somewhat," and that J.H.C. was "very concerned" about Father's welfare and needs.

McMurray expressed concern about specific conduct by Father that the children had told her about. First, Father told the children that, "Jesus is mad at Mommy because Mommy won't come back to Daddy." He also asked the children to pray that Mother would return to the marriage. In McMurray's opinion, Father should not discuss with the children whether Mother is sinful or not sinful. Second, Father instructed J.H.C. to keep secrets from Mother. Specifically, Father told J.H.C. not to tell anyone that she was sleeping in the same bed as Father. In McMurray's opinion, secrets are never good in families and are particularly problematic with young children. Third, Father instructed I.K.C. and his great-nephew to call J.H.C. "Mom," and McMurray was concerned that J.H.C. was assuming that role at Father's house to some degree. Finally, Father told J.H.C. that she was special and that God had a special plan for her, but Father did not make similar statements to I.K.C. McMurray was concerned that J.H.C. could take Father's statement to mean that she is better than her siblings.

According to McMurray, children who had "demonstrated loose boundaries" could have difficulty establishing boundaries in their future relationships. McMurray testified that whether Father's behavior with J.H.C. was "grooming" behavior depends on what is meant by that term. McMurray stated that she was not claiming that Father was "grooming" the children, but she believed that

9

Father's behavior was emotionally confusing to J.H.C. If Father was engaged in "grooming" behavior, J.H.C. could tend to form relationships with men who have the same approach to relationships as Father does. These types of men are sometimes "perpetrators" and have a sense of which individuals to target because they can be "easily swayed."

Father denied that he ever discussed the divorce with the children, told the children that Jesus was angry with Mother, required the other children to call J.H.C. "Mom," or spoke negatively about Mother to the children. Father further denied that he told J.H.C. that she was more special than the other children, that J.H.C. slept in his bed with him, or that he encouraged the children to keep secrets.

Allison Sims, the principal at J.H.C.'s school, testified that Father comes to the school almost daily for student drop-off and seems to be a good father. Father also has lunch with J.H.C. at school, but does not do so "excessively." In Sims's opinion, Father has not crossed any boundaries as far as keeping J.H.C. independent. Suzanne Bailey, the director of the foster care agency working with Father's great-nephew, testified that Father was a good father and that she would trust him with her children. Sherry Hall, the church secretary, and Kayla McCartor, a member of the church, both testified that Father is a good father and that all of his children love him.

The trial court named Mother as sole managing conservator and Father as possessory conservator of J.H.C. and I.K.C.; ordered that Father would have supervised possession of the children on two Saturdays a month for four hours and could have no other contact with the children except for one fifteen-minute phone call on Tuesday evenings following a weekend on which he did not have possession of the children and lunch with the children on Thursdays during the school year; and

ordered that Father participate in an evaluation with Dr. Jason Dunham and attend counseling with Dr. Stephen Allison in order to address Father's activities with Mother while he was her youth pastor, as well as his behavior with the children and the things that he discusses with them. In a letter dated May 18, 2017, the trial court also ordered that Father immediately deposit his firearms with the Abilene Police Department for a period of ninety days.

At Father's request, the trial court made findings of fact and conclusions of law. As to conservatorship, the trial court found that it was not in the best interest of the children for Father and Mother to be appointed joint managing conservators; that it was in the best interest of the children for Mother to be named sole managing conservator and Father to be named possessory conservator; that Father and Mother were unable to communicate with one another in a manner that allowed them to reach shared decisions for the children; that Father initiated a relationship with Mother when she was a minor; that Father used increasingly manipulative and volatile techniques, including threats of suicide, in order to maintain his position of authority over Mother; that, although there was no evidence Father had sexually assaulted the children, he had engaged in behavior that appeared "grooming" in nature; and that Father's periods of possession of the children varied from the standard possession order to protect the children and were the least restrictive necessary in order to accomplish that goal.

*Analysis*

The best interest of the child is always the primary focus of conservatorship issues, TEX. FAM. CODE ANN. § 153.002 (West 2014), and the trial court is given wide latitude in determining the best interest of a child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). We review a trial court's decision as to

conservatorship or possession of a child for a clear abuse of discretion. *In re A.J.E.*, 372 S.W.3d 696, 698 (Tex. App.—Eastland 2012, no pet.). "A trial court abuses its discretion when it acts arbitrarily or unreasonably, or when it clearly fails to correctly analyze or apply the law." *Id.* (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)).

In family law cases, legal and factual sufficiency challenges are not independent grounds of error but, rather, are factors used in determining whether the trial court abused its discretion. *Id.* In conducting our analysis, we consider whether the trial court had sufficient information upon which to exercise its discretion and, if so, whether it erred in the application of its discretion. *Id.* at 699. The sufficiency review is part of the first inquiry. *Id.* After assessing the evidence, we consider whether, based on that evidence, the trial court made a reasonable decision. *Id.*

In considering whether the trial court abused its discretion, we keep in mind that the trial court "is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). Therefore, a trial court does not abuse its discretion when it bases its decision on conflicting evidence, *In re C.F.*, 565 S.W.3d 832, 845–46 (Tex. App.—Houston [14th Dist.] 2018, pet. denied), or when evidence of substantive and probative character supports the decision. *A.J.E.*, 372 S.W.3d at 699.

In his first issue, Father argues that, in light of the statutory presumption in favor of joint managing conservatorship, there is insufficient evidence to support the trial court's appointment of Mother as the sole managing conservator of J.H.C. and I.K.C.

Under Section 151.131 of the Family Code, both parents must be appointed joint managing conservators unless the trial court finds that the appointment would significantly impair the child's physical health or emotional development. FAM. § 153.131(a). It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the child's best interest. *Id.* § 153.131(b). The parent seeking to be named sole managing conservator has the burden to rebut this presumption. *Turrubiartes v. Olvera*, 539 S.W.3d 524, 528 (Tex. App.— Houston [1st Dist.] 2018, pet. denied); *see also In re A.A.E.*, No. 05-18-00210-CV, 2019 WL 1552450, at *2 (Tex. App.—Dallas Apr. 10, 2019, no pet.) (mem. op.). In deciding whether the presumption has been rebutted, the trial court must consider:

1. whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

2. the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

3. whether each parent can encourage and accept a positive relationship between the child and the other parent;

4. whether both parents participated in child rearing before the filing of the suit;

5. the geographical proximity of the parents' residences;

6. if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and

7. any other relevant factor.

FAM. § 153.134(a); *Turrubiartes*, 539 S.W.3d at 528–29; *see also Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (setting out factors to be considered when determining best interest of the child).

The trial court determined that it was not in the best interest of J.H.C. and I.K.C. for both parents to be appointed joint managing conservators and that it was in their best interest for Mother to be appointed sole managing conservator of the children. In reaching that conclusion, the trial court found that Father and Mother were unable to communicate with one another in a manner that allowed them to reach shared decisions in the children's best interest. The trial court also made findings that Father had initiated a relationship with Mother when he was in a position of authority over her, used manipulative techniques to control Mother, and had started to engage in manipulative behavior with the children that appeared "'grooming' in nature."

Viewed in the light most favorable to the trial court's findings, the evidence established that, while a youth pastor at a church, Father had an inappropriate relationship with a teenage girl who belonged to the youth group. Father subsequently became the youth pastor at the church in Coleman that Mother attended. Father's relationship with Mother began when she was a minor seeking counseling from him, as her pastor, on how to deal with her inappropriate relationship with her teacher. Rather than contacting the authorities, Father essentially told Mother that the inappropriate relationship was her fault and then initiated his own inappropriate sexual relationship with her. Father eventually used threats of suicide to induce Mother to marry him.

Once the parties' marriage began to deteriorate, Father continued to manipulate Mother's emotions. He again threatened suicide and staged a kidnapping of I.K.C. from the daycare. He also made statements and engaged in conduct that caused Mother to be afraid that he would kill her. Father used his position as a pastor to attack Mother and her friends. He also told the children that Jesus was mad at

Mother for leaving the marriage and instructed them to pray for her to return to Father. He manipulated the children by repeatedly making statements about how much he missed them and how lonely he was without them, resulting in the children sobbing and crying immediately before bedtime.

Father's conduct led J.H.C. to become overly concerned about his welfare and with pleasing him. Further, Father slept in the same bed as J.H.C. and told her not to tell anyone about it. He also instructed the other children to call J.H.C. "Mom," and McMurray was concerned that J.H.C. was assuming that role at Father's house. According to McMurray, Father's conduct was emotionally confusing to J.H.C., and Father's lack of boundaries with J.H.C. could cause her to have unhealthy relationships in the future, including relationships that were sexually abusive.

We recognize there was also evidence that Father loved the children, that they loved him, and that Father was a good father. Further, Father denied that he engaged in the behaviors about which McMurray expressed concern. However, it was the role of the trial court to resolve the conflicts in the evidence, and based on its findings, the trial court did not find Father to be credible. *See In re Marriage of Harrison*, 557 S.W.3d 99, 133 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (noting that, in determining father should be named sole managing conservator of the children, trial court was sole judge of the credibility of the witnesses and determined mother was not credible); *A.L.E.*, 279 S.W.3d at 427 (noting appellate court must defer to trial court's resolution of conflicting evidence and to credibility determinations that may have affected its determination).

On this record, we conclude that there was substantive and probative evidence to rebut the presumption that appointing Father as a joint managing conservator was in the best interest of the children. Further, the trial court did not abuse its discretion

by determining that the appointment of Mother as sole managing conservator and Father as possessory conservator was in the children's best interest. We overrule Father's first issue.

In his second issue, Father contends that the evidence is insufficient to support the trial court's deviation from the standard possession order or its determination that the possession provided to Father was the least restrictive option available to protect the children.

The Family Code provides guidelines for determining the periods of possession for a possessory conservator who resides less than 100 miles from the child's primary residence. FAM. § 153.312. There is a rebuttable presumption that the standard possession order provides reasonable minimum possession of a child for a parent named as a possessory conservator and that the order is in the best interest of the child. *Id.* § 153.252; *In re A.K.B.*, No. 11-16-00319-CV, 2017 WL 2698399, at *2 (Tex. App.—Eastland June 15, 2017, no pet.) (mem. op.). However, if there is sufficient evidence to rebut this presumption, the trial court may deviate from the times of possession in the standard possession order. *A.K.B.*, 2017 WL 2698399, at *2. When ordering terms of possession that deviate from the standard possession order, the trial court may consider (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named possessory conservator; and (3) any other relevant factor. FAM. § 153.256.

A trial court does not abuse its discretion by restricting a parent's possession and access when the record contains evidence to support a finding that such restrictions are in the child's best interest. *Marriage of Harrison*, 557 S.W.3d at 131. An order restricting a parent's right to possession of or access to a child may

not impose restrictions beyond those required to protect the child's best interest. FAM. § 153.193; *Marriage of Harrison*, 557 S.W.3d at 131.

Although the trial court appointed Father as possessory conservator of the children, it did not give him possession of the children pursuant to the standard possession order. Rather, the trial court ordered that Father would have supervised possession of the children for four hours on two Saturdays a month. The only other contact Father is allowed with the children is a fifteen-minute phone call on the Tuesday following a weekend during which he does not have possession of the children and lunch with the children on Thursdays during the school year. The trial concluded that it was necessary to vary Father's periods of possession from those in the standard possession order in order to protect the children and that the terms of Father's possession were the least restrictive terms that would accomplish that goal.

As set out above, there was substantive and probative evidence that (1) Father initiated a relationship with Mother while she was a minor and he was her youth pastor; (2) Father had another inappropriate relationship with a minor over which he had a position of authority; (3) Father attempted to keep Mother in the marriage by threatening suicide, staging the kidnapping of I.K.C., and misleading church parishioners about Mother's behavior; (4) Father's statements and conduct made Mother fear for her safety; (5) Father and J.H.C. slept in the same bed and Father asked J.H.C. to keep it a secret; (6) Father asked the other children to call J.H.C. "Mom"; (7) Father engaged in manipulative conduct with J.H.C. that caused her to be very concerned about his welfare and made her want to take care of him; (8) Father had discussions with the children that could cause them to think Mother was bad or "sinful"; (9) Father had boundary issues with the children, particularly

17

J.H.C.; and (10) children with "loose boundaries" could have difficulty sustaining healthy relationships and could be a target for "perpetrators."

On this record, we conclude that there is substantive and probative evidence to support the trial court's determination that Father's periods of possession of the children should vary from the standard possession order. Further, viewing the evidence in the light most favorable to the trial court's ruling, the trial court could have reasonably concluded that maintaining supervised visits and limiting Father's periods of possession of and access to the children were the minimal restrictions necessary to protect the children's best interest. We overrule Father's second issue.

In his third issue, Father contends that the trial court's order requiring him to surrender all firearms to law enforcement for a period of ninety days is not supported by the evidence and is unconstitutional.

Courts are limited to deciding cases in which an actual controversy exists. *Fed. Deposit Ins. Corp. v. Nueces Cty.*, 886 S.W.2d 766, 767 (Tex. 1994). An actual controversy must exist between the parties at every stage of the legal proceeding, including the appeal. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). "Generally, a case is determined to be moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Camarena v. Tex. Emp't Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1983) (per curiam)); *see also Albert Lee Giddens, APLC v. Cuevas*, No. 14-16-00772-CV, 2017 WL 4159263, at \*5 (Tex. App.—Houston [14th Dist.] Sept. 19, 2017, no pet.) (mem. op.).

On May 18, 2017, the trial court ordered Father to immediately deposit all firearms in his possession with the Abilene Police Department for ninety days. By its terms, the trial court's order pertaining to Father's firearms expired on August 16,

2017. Therefore, Father's complaint that the trial court erred by ordering Father to surrender his firearms to the Abilene Police Department is moot and presents nothing for our review. We overrule Father's third issue.

In his fourth issue, Father contends that the trial court did not have the authority to order him to participate in an evaluation and counseling into perpetuity. Father specifically complains that the order for counseling has no statutory foundation and is "not conditional, not linked to possession of his children, not tied as a condition to lifting restrictions otherwise lawfully imposed."

A court may order a party to participate in counseling with a qualified mental health professional if it finds at the time of the hearing that the parties have a history of conflict in resolving an issue of conservatorship or possession of or access to the child. FAM. § 153.010; *In re Scheller*, 325 S.W.3d 640, 645 (Tex. 2010) (orig. proceeding) (per curiam). There is no requirement in Section 153.010 that the ordered counseling be conditioned on or linked to any possession of the children or tied as a condition to lifting restrictions imposed on the party's possession of or access to the party's child. *See* FAM. § 153.010

We recognize that in *In re Marriage of Swim*, 291 S.W.3d 500, 508 (Tex. App.—Amarillo 2009, no pet.), the Amarillo Court of Appeals concluded that the trial court acted outside the discretion afforded it by Section 153.010 by ordering that the father continue counseling, among other things, without making the counseling a condition precedent to possession of and access to the child or making compliance a requirement to obtain or enhance the father's right of possession and access. The Amarillo court's conclusion, however, was in response to the father's argument that the counseling and other requirements deprived him of the protections afforded incapacitated persons under the Probate Code, as it existed at that time,

19

because the order was not related in any manner to the child who was the subjection of the litigation.  *Id.*; *see* former TEX. PROB. CODE §§ 601–726, *redesignated and repealed by* Act of May 19, 2011, 82 Leg., R.S., ch. 823, §§ 3.01–.02, 2011 Tex. Gen. Laws 1901, 2094–95 (current version in the Texas Estates Code).  Father has not raised a similar argument in this appeal.

There was substantive and probative evidence that Father and Mother had a history of conflict about possession of and access to the children.  Further, the trial court found that Father and Mother were not able to communicate with one another in a manner that allowed them to reach shared decisions in the children's best interest.  Father has not argued on appeal that the trial court's finding is not sufficient under Section 153.010 to support the trial court's order that Father participate in counseling.  We conclude that the trial court did not abuse its discretion by ordering Father to participate in counseling.  We overrule Father's fourth issue.

### This Court's Ruling

We affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE

June 20, 2019

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.